AMERICAN BELL TELEPHONE Co. *v.* GLOBE TELEPHONE Co. and others.

(*Circuit Court, S. D. New York.*  July 19, 1887.)

1. PATENTS FOR INVENTIONS—INFRINGEMENT—ACTS WARRANTING INJUNCTION—BELL TELEPHONE.

Letters patent No. 174,465 were granted March 7, 1876, to Alexander Graham Bell, for certain improvements in telegraphy, the fifth claim of which, relating to the transmission of speech by electricity, became entitled, by judicial construction, to a broad interpretation in favor of the inventor. Prior to 1885 the Globe Telephone Company was incorporated under the laws of New York, the object of its formation being to manufacture, sell, license, and lease telegraphic, telephonic, and electric instruments, and supplies therefor, and to acquire and dispose of patents, patent-rights, and inventions relating thereto. The company acquired certain patents, which were shown to be infringements upon the Bell patent, and put up in their office sample instruments of an infringing character. They also, by advertisements, invited the public to purchase their instruments, and become licensees of their patents and claims. No instruments, however, were ever actually made or used, except experimentally, and none were ever sold. *Held,* that the acts of the company were sufficient to warrant a decree restraining infringement.

2. SAME—INVENTION OF MEUCCI—PRIORITY.

The experiments and invention of one Antonio Meucci, relating to the transmission of speech by an electrical apparatus, for which invention a caveat was filed in the United States patent-office, December 28, 1871, renewed in December, 1882, and again in December, 1883, do not contain any such elements of an electric speaking telephone as would give the same priority over or interfere with the said Bell patent.

*E. N. Dickerson* and *J. J. Storrow,* for complainant.
*D. Humphries* and *S. R. Beckwith,* for defendants.

WALLACE, J.  The complainant has filed this bill to restrain infringement of the patent granted by the United States to Alexander Graham Bell, dated March 7, 1876, No. 174,465, for improvements in telegraphy. Infringement is also alleged of the United States patent to Bell, No. 186,787, dated January 30, 1877, for improvements in electric telephony; but the proofs have not been addressed to the question of the infringement of this patent, and it is practically out of the case. The fifth claim of the first patent has been judicially construed in two cases by the circuit court for the district of Massachusetts, and in both of these cases it was substantially held that Bell was the discoverer of the new art of transmitting speech by electricity, and that the claim should receive the broadest interpretation to secure to the inventor, not the abstract right of sending sounds by telegraph without regard to means, but all means and processes described which are essential to the application of the principle. *American Bell Telephone Co.* v. *Dolbear,* 15 Fed. Rep. 448; *Same* v. *Spencer,* 8 Fed. Rep. 509. This court, in *American Bell Telephone Co.* v. *Molecular Telephone Co.,* followed the construction thus placed upon the claim. 23 Blatchf. 253, 32 Fed. Rep. 214.

The proofs for the complainant show that the apparatus, which it is alleged has been used and offered for sale by the defendants, embodies

the means and process for transmitting speech by electricity which are the subject of the fifth claim of the patent to Bell; and no evidence has been introduced by the defendant to controvert this fact.

The defendants answer separately. The answer of the Globe Telephone Company and of the defendant Rogers consists merely of general and specific denials of the averments of the bill. The answer of the defendant Meucci alleges that he was the first and prior inventor of the telephone; that in 1871, by a series of improvements and experiments in telephony, he had perfected a perfect speaking telegraph, which comprised all the electrical principles since known in the art of telegraphy; that he has never made, used, or sold any telephones or speaking telegraphs for any purpose whatever, except that for more than 24 years he has had, during most of the time, at his residence at Staten Island, a speaking telephone for domestic use; that prior to 1876 he endeavored to introduce the invention of said telephones into public use, but, by reason of his poverty, was unable to do so; and to that end did cause the same to be published in the newspaper the Eco D'Italia, and did endeavor to secure the assistance of others by making known to them his said invention. The answer of the defendant Beckwith consists of a general denial of the averments of the bill, and sets up the priority of the invention of Meucci.

Inasmuch as none of the defendants set up, by way of defense, any prior patents, publications, or instances of prior invention or public use, except the prior invention of Meucci, and their proofs consist only of evidence of Meucci's invention, and evidence to show that they have never used, manufactured, or sold electric speaking telephones, or procured or assisted others to do so, it is unnecessary, and would be extraneous to the real questions in the case, to consider the point, made in the brief of the counsel for one of the defendants, that the fifth claim of Bell's patent of 1876 is not entitled to the broad construction which has heretofore been given to it by the courts. The only questions really involved are whether the acts of the defendants are an infringement of the exclusive rights of the complainant to manufacture, use, and sell the electric speaking telephone, and whether the proofs establish the defense that Meucci was the prior and original inventor of that apparatus.

The bill was filed November 10, 1885. At that time the Globe Company had been incorporated about two years and a half. It was a New York corporation. Its certificate of incorporation recites that the objects for which the company is to be formed are to "manufacture, sell, license, and lease telegraphic, telephonic, and electric instruments, and supplies therefor of every description, and to acquire, by purchase or license or otherwise, and dispose of by sale, license, or otherwise, patents, patent-rights, and inventions relating thereto, and incidental to the manufacture of said instruments and supplies." In August, 1885, the defendant Beckwith became the general manager of that company. At that time he was interested in an invention patented in England known as the "Bassano-Slater telephone," and had agreed with the owners to procure a patent for the invention in this country, and had the

right to use and introduce the invention here. That company was the owner of patents which had been issued to Shaw and to Hadden for inventions in telephonic instruments. When Beckwith became manager, the company entered into a written agreement with him by which it promised to use the Bassano-Slater invention in its business, unless by subsequent agreement the parties should agree to substitute other inventions. Beckwith was to have a large share of the profits of the company. It was also agreed between Beckwith and the company that the latter would secure, "for purposes of defense, the so-called Antonio Meucci claims evidenced by *caveat* filed in the United States patent-office." From the time Beckwith became manager until this suit was brought the company seems to have been mainly engaged in advertising its pretensions as a competitor of the American Bell Telephone Company in trying to procure money, and in endeavoring to enlist others to become purchasers or licensees of its rights in telephone inventions. It had a capital stock of nominally $10,000,000, and but very little real capital. Its officers soon became aware that its patents were worthless, unless the Bell patent could be invalidated. It had not manufactured any telephone instruments, nor did it have any for sale, but it had in its office certain instruments, the history of which is stated by Mr. Bowen, one of its directors. He testifies as follows: "At a board meeting I raised the question, 'have we got any instruments of any kind?' and it was stated by Mr. Beckwith that we had the Bassano-Slater instruments. The Shaw and Hadden were both infringements upon the Bell, and could not be used. It was then suggested by Mr. Beckwith that we could use the Bassano-Slater instruments; that we could use them in connection with the Meucci instruments, and it would make a first-class instrument. Then I think the question came up before the board in reference to having made a set of instruments for a sample set, to have in the office to show what they were, as we had nothing. I think I stated at that time that as long as I had been a member of the company I had not seen anything that looked like an instrument to show anybody. At that meeting there was an order issued by the board authorizing Mr. Beckwith to have made a set of sample instruments, such as he deemed proper and sufficient for testing, for samples, to have in the office to be exhibited." These instruments were put up in the office of the company in the Mills Building, on Broad street, New York city, by Beckwith, and connected with the office of Mr. Hadden, the electrician of the company across the street. They were used for several weeks to communicate with Mr. Hadden, and for the purpose of illustrating to others what telephones the company proposed to introduce to compete with the American Bell Telephone Company.

During all this time the officers of the company were unwilling to commit it to any acts of open infringement of the Bell patents, fearing that the Bell Company might obtain an injunction, and thus embarrass their operations. But they were holding themselves out to the public as the owner of patents which would protect the purchasers or licensees against the claims of the Bell Company, and as prepared to furnish to purchasers

or licensees telephone instruments made in accordance with such patents. In September, 1885, the company issued a circular, in which it recited the history of the first Bell patent, and the discovery of the prior invention of Meucci. The circular stated that the company was able to fully substantiate the fact that Meucci was the first inventor, and that, besides securing his title to the original invention of the Electro Magnetic Telephone, the company had procured telephone instruments operating upon a different principle from those of the American Bell Telephone Company, and which were not infringements of the patents of that company. The circular invited the public to purchase the instruments, and to promote the formation of companies to become licensees under its patents and claims.

The theory of the Globe Company is that it has never made or used telephone instruments, except experimentally, to test their operativeness; that it has never sold any; that its officers were aware that it could not do so without danger of legal proceedings by the American Bell Telephone Company until the Bell patent could be successfully contested; and that they were waiting until that time should arrive, and in the mean time proposed studiously to avoid allowing anything to be done that would bring their company in conflict with the American Bell Telephone Company. The testimony of its officers is inconsistent with their conduct. The instruments put up in the office of the company were undoubtedly put there and used to demonstrate to the public that the company could supply practical commercial telephones to licensees and subcompanies. When the September circular, inviting the public to purchase telephones, was issued, the officers of the company doubtless intended to refer to telephones of the description put upon exhibition in their office as the instruments which could be used. This is indicated by what took place subsequent to the filing of the present bill. It is shown that after this suit was commenced, and after an application for an interlocutory injunction against the company had been denied by this court because there was not sufficient proof of acts of infringement on the part of the company, the company, by its manager, Mr. Beckwith, procured a company to be organized in New Jersey, called the Meucci Telephone Company, for the purpose of erecting a telephone exchange in the city of Elizabeth, and purchasing the rights of Meucci in his invention of telephones for such purpose. The contract made by Beckwith with the Meucci Company authorized that company to use in their exchange the inventions of Meucci, Bassano, Shaw, and Hadden, one or more of them; and that contract was ratified by the board of directors of the Globe Company by a resolution of March 30, 1866. Shortly thereafter the officers of the company concluded it would be safer not to execute the contract made in the name of Beckwith until it had the approval of their attorney, and, after consultation with the attorney, there was never any formal execution of a contract. The Meucci Company erected a telephone line in Elizabeth, and used upon it telephone apparatus similar to that which had been used in the office of the Globe Company.

The proofs establish satisfactorily that the instruments used in the office of the Globe Company are infringing instruments; and it is plain that the use of these instruments in the manner and for the purposes disclosed by the proofs is sufficient to authorize an injunction against the defendant. All the defendants were acting in concert together. Rogers was the secretary and treasurer of the Globe Company. Beckwith, as has been stated, was its manager. Meucci was its nominal electrician. All of them were acting in co-operation, in endeavoring to incite others to appropriate and infringe the rights of the complainant.

The defense, so far as it rests upon the priority of invention by Meucci, may be briefly disposed of. The circumstance that this defense is not relied upon by the Globe Company in its answer, and that its counsel has insisted in his argument that it should not be considered because not satisfactorily presented by the proofs, although indicating that the principal defendant has no confidence in the asserted priority of invention by Meucci, ought not to prejudice the position of the defendant Beckwith, who relies upon this defense, has urged it with great zeal, and is evidently convinced of its truth.

As was held in the *Drawbaugh Case*, 22 Blatchf. 531, 22 Fed. Rep. 309, the patentee starts with the benefit of the presumption of law that he was the first and original inventor of that for which the letters patent were granted him, and whoever alleges the contrary must assume the burden of proof, and the defense of want of novelty or originality must be made out by evidence so clear and satisfactory as to remove all reasonable doubt.

According to Meucci's story, while he was at Havanna, employed as a machinist and decorator of a theater there, and in the year 1849 or 1850, he discovered how to obtain the transmission of words by means of conducting wire, united with several batteries to produce electricity, and gave his discovery the name of the "Speaking Telegraph." In 1850 he came to this country, and took up his residence at Clifton, Staten Island, where he has ever since resided. He was engaged in various kinds of business, particularly candle making, and the manufacture of paper from vegetable fibre, and at one time had a brewery. He states that soon after coming here he resumed his experiments with the telephone; that before 1860 he had good working instruments; and before 1865 had instruments which embodied the essentials of the modern magnetic instruments. These instruments he asserts were known to his friends; were in use at his house before and during the years 1864 and 1865, and subsequently. He describes them from his memory. The originals are not in existence. He states that in 1860 he thought his invention sufficiently perfected to introduce it, and about that time applied to his friend Bendelari, who was going to Italy, to try to get assistance to perfect the invention, and bring it into use. He says that he felt anxious to have his invention first appear from his old home, and thought Bendelari would be able to bring the invention out there; and he therefore gave a pretty full description of it to Bendelari, and also about this time published the fact that he had made the invention in an

Italian newspaper published in New York called "Echo L'Itallienne."
He states that after this, until 1871, from time to time, he experimented
to make improvements in his invention, but made no particular im-
provements after 1864 or 1865. He says that in 1871 he found that
his wife, during his illness, had, without his knowledge, sold all the in-
struments and devices he had used in his experiments in sound teleg-
raphy, except some bobbin, a part of a permanent magnet, and some
fragments of pasteboard, which he subsequently found, to a dealer in
second-hand articles. In the latter part of 1871 he entered into an agree-
ment with three of his Italian friends, by which they became copartners
in the business of perfecting and introducing his invention. The writ-
ten agreement bearing date December 12, 1871, is produced, and recites
the business of the copartnership as that of "making and trying all the
necessary experiments for the accomplishment of the transmission of the
human voice through electric wires invented by the aforesaid Antonio
Meucci." These parties immediately took steps looking to the procure-
ment of a patent, consulted Mr. Stetson, a patent expert and solicitor,
and, under his supervision, an application for a *caveat* was prepared,
and was filed in the patent-office, December 28, 1871. Soon thereafter
Meucci consulted again with Mr. Stetson, with a view of making an ap-
plication for a patent for the invention, but Mr. Stetson discouraged the
attempt. Upon the application of Meucci, the *caveat* was renewed in
December, 1882, and again in December, 1883. It is not claimed that
Meucci made any essential improvements upon his invention subsequent
to the time he obtained the *caveat*, but, as has been said, he states him-
self that he made none after 1865.

Such in brief is Meucci's own history of his invention. There is no
reason to doubt that for many years prior to 1865, and from that year
until he applied for the *caveat*, he had been experimenting with tele-
phonic and electrical apparatus with a view of transmitting speech, and
during this time had convinced himself that he had made interesting
discoveries, which might eventually become useful ones. To this ex-
tent he is corroborated by the testimony of a number of witnesses. But
the proofs fail to show that he had reached any practical result beyond
that of conveying speech mechanically by means of a wire telephone.
He doubtless employed a metallic conductor as a medium for conveying
sound, and supposed that by electrifying the apparatus or the operator
he could obtain a better result. That he did not believe he had accom-
plished anything of practical commercial utility is a reasonable inference
from the fact that he did not communicate his invention to those who
would have been likely to appreciate it, and assist him in perfecting and
introducing it to the public. Between 1859 and the time of his appli-
cation for a *caveat* he filed many applications for patents for other in-
ventions. During the years 1859, 1860, and 1861 he was in close busi-
ness and social relations with William E. Ryder, who was interested in
his inventions, paid the expenses of his experiments, and, in connection
with others whom he introduced to Meucci, invested a considerable
amount of money in Meucci's inventions, and their use in business enter-

prises.   He was a constant visitor at Meucci's house, lived near him, and seems to have been his closest personal friend and business adviser. Their intimate relations continued until 1867, when Ryder became satisfied that Meucci's inventions were not sufficiently practical or profitable to devote more time and money to them, and their intimacy ceased, although as late as in 1871 he interested himself for Meucci to dispose of some of his inventions.   During all these years, according to the testimony of Mr. Ryder, he never heard from Meucci, or anybody else, of Meucci's telephone.   In 1864 and 1865 David H. Craig was a partner with Meucci and Ryder in the paper manufacture.   He had been intimately associated with others in telegraph inventions and patents, and his interest in such matters must have been known by Meucci.   He never heard, from Meucci or otherwise, that Meucci had invented or was experimenting with the telephone.

The *caveat* itself is sufficient to indicate that he had reached no practical result.   There is no reason to doubt that his application contained the best description of his invention which he was then able to give. Before consulting Mr. Stetson, Meucci prepared a description of his invention, intending to make an application for a patent.   After consulting Mr. Stetson, he concluded to make application for a *caveat* only. With the aid of an interpreter, and the manuscript containing the description, Mr. Stetson prepared the formal application.   After it had been prepared by Mr. Stetson, it was sent by him to Meucci, and returned by the latter with amendments to be inserted in it.   It is sufficient to say that the application does not describe any of the elements of an electric speaking telephone.   Its opening statement refutes the possibility that Meucci understood the principle of that invention.   Meucci states that he employs "the well-known conducting effect of continuous metallic conductors as a medium for sound, and increases the effect by electrically insulating both the conductor and the parties who are communicating."   As originally expressed by Mr. Stetson, it contained this statement:

"The system on which I propose to operate consists in isolating two persons, separated at considerable distances from each other, by placing them upon glass insulators, employing glass, for example, at the feet of the chair or bench on which each sits, and putting them in communication by means of a telegraphic wire."

As amended pursuant to Meucci's instructions, this statement was qualified as follows:

"It may be found practicable to work with the **person** sending the message insulated, and with the person receiving it in free electrical communication with the ground.   Or these conditions **may possibly** be reversed, and still operate with some success."

It is idle to contend that an inventor having such conceptions could at that time have been the inventor of the Bell telephone.   The application does, however, describe a mechanical telephone, consisting of a mouth-piece and ear-piece connected by a wire.   A letter written by Mr. Stetson of the date of January 13, 1872, is in evidence, and is im-

portant as confirmatory of the conclusion that beyond this the invention was only inchoate.    This letter was written to Meucci when the latter was in communication with Mr. Stetson in reference to obtaining a patent for the invention.    In this letter Mr. Stetson, in substance, advised Meucci that his invention was not in a condition to patent; telling him that it was "an idea giving promise of usefulness," and the proper subject of a *caveat,* but requiring many experiments to prove the reality of the invention.

Without adverting to other evidence tending to indicate that Meucci was merely an experimentalist who had not produced anything new in the art of transmitting speech by electricity, it suffices to say that his pretensions are overthrown by his own description of the invention at a time when he deemed it in a condition to patent, and by the evidence of Mr. Stetson.    The evidence leaves the impression that his speaking telegraph would never have been offered to the public as an invention if he had not been led by his necessities to trade on the credulity of his friends; that he intended to induce the three persons of small means and little business experience, who became his associates under the agreement of December 12, 1871, to invest in an invention which he would not offer to men like Ryder and Craig; and that this was done in the hope of obtaining such loans and assistance from them as he would temporarily require.

A decree is ordered for the complainant.